STOP THE OLYMPIC PRISON,
Plaintiff,

v.

UNITED STATES OLYMPIC
COMMITTEE, Defendant.

No. 78 Civ. 4691 (JMC).

United States District Court,
S. D. New York.

Feb. 15, 1980.

Leon Friedman, New York City (Clark, Wulf, Levine & Peratis, and Richard Emery, New York Civil Liberties Union, New York City, of counsel), for plaintiff.

James S. Morris, New York City (Michael S. Press, W. Anthony Stewart and Whitman & Ransom, New York City, of counsel), for defendant.

## OPINION

CANNELLA, District Judge:

After a trial on the merits, on the plaintiff's complaint for a declaratory judgment, and on the defendant's counterclaims, the Court finds for the plaintiff.

The counterclaims by the defendant are dismissed.

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## FACTS

More than half a century has passed since Learned Hand acknowledged a chewing gum maker's interest against an ironmonger's use of his mark.[1] This period has seen the birth and boom of television, large national and international corporations and conglomerates, and the art and science of mass marketing through widely recognized brand names and marks. The new age, perhaps not even imagined in 1928, is one of "official" sports league knit caps, "Star Trek" meals at hamburger restaurants, and "a company called TRW."

That widespread recognition of a name and marks could itself be marketed for their owner's benefit has not been lost on the United States Olympic Committee ["U.S.O.C."], the defendant in this action, or on the drafters of its new charter.[2] The 1980 Winter Olympics now has an "official camera," an "official car," and an "official imported beer." The companies that produce these and similarly identified products are entitled to advertise them as such, and to sport on them certain symbols universally associated with the Olympics. In exchange for this privilege, they make badly needed contributions to the United States Olympic Teams.

The instant case concerns the scope of protection to be afforded to some of these symbols, which are registered as trade and service marks to the U.S.O.C. The plaintiff, Stop The Olympic Prison, or S.T.O.P., is the publisher of an allegedly infringing poster.[3]

The top half of the poster consists of the words "STOP THE OLYMPIC PRISON" in large, striking letters. Immediately below is a drawing of five vertical steel-grey bars upon which are superimposed five interlocking rings in an arrangement universally recognized as a symbol of the Olympic Games. Thrusting through the bars and the rings is a silhouetted forearm clutching a flaming torch. Beneath the drawing, in 3/16-inch lettering, is the following legend:

1. *Yale Electric Corp. v. Robertson*, 26 F.2d 972, 973–74 (2d Cir. 1928).

2. 36 U.S.C. §§ 371–396 (as amended Nov. 8, 1978).

3. A copy of the poster is appended hereto as Appendix A.

S.T.O.P. (Stop The Olympic Prison) 3409 East Genesee St. Syracuse, NY 13224 Phone 315/446–6151

Co-Sponsors: New York Moratorium on Prison Construction, National Moratorium on Prison Construction

S.T.O.P. is not organized for profit, and, on the basis of the evidence adduced in this case, has never made any. While it admits to having sold some of the posters for one dollar apiece, this appears to have been largely a means of soliciting contributions for its cause, since most of the posters were given away free. None of the posters are sold or distributed by commercial outlets such as bookstores.

S.T.O.P.'s purpose in designing, printing and distributing the poster is and has always been to publicize and marshal public opposition to current plans to convert the Olympic Village in Lake Placid into a prison after the Winter Games. The genesis of this plan dates back to 1976, when, after the International Olympic Committee had officially designated Lake Placid as the site of the 1980 Winter Olympics, Congress authorized $49 million in federal funds for the construction of facilities for the Games. As a condition for the appropriation, Congress required that any facilities built for the Olympics be subsequently put to some permanent use.[4] In view of the considerable expense, this would appear to be a laudable bit of legislative foresight.[5]

In seeking a subsequent use for the planned Olympic Village to house the athletes, the Lake Placid Olympic Organizing Committee ["L.P.O.O.C."][6] considered several alternatives, including college dormitories and public housing, but eventually decided that the most propitious one would be a prison. The Federal Bureau of Prisons concurred, and asked Congress to authorize funds for a medium security facility for young offenders. Congress gave its approval, the State of New York donated 155 acres of woodland in Ray Brook, about five miles from Lake Placid, and design and construction soon began.[7]

The construction of a new federal prison at Ray Brook, and its temporary use by Olympic athletes, soon attracted public criticism.[8] Among the more active opponents

---

**4.** At the behest of the House of Representatives, Congress inserted the following provision into the authorization bill:

The Secretary [of Commerce], in coordination and consultation with State and local officials, shall take such action as may be necessary and appropriate to assure that all winter games facilities for which Federal financial assistance is provided, under this Act, are planned, designed, and constructed or improved in a manner which will provide maximum continued public use and benefit following the conclusion of the Olympic winter games.

Olympic Winter Games Authorization Act of 1976, Pub.L.No.94–427, § 6, 90 Stat. 1336, 1338 (1976).

**5.** *See* H.R.Rep.No.94–1167, 94th Cong., 2d Sess. 3, 6 (1976).

**6.** The defendant's Answer asserts that the L.P. O.O.C. is a not-for-profit corporation "separate and apart from and . . . not subject to the control of, the U.S.O.C.," and that the L.P. O.O.C. has "exclusive jurisdiction over and responsibility for the organization of the 1980 [Winter] Olympic Games." Answer and Counterclaim at 2, 4–5 (filed Nov. 14, 1978).

**7.** These events are recounted in much greater detail in Potter, *The 'Olympic Prison'—An Ob-*

*vious Choice or a 'Chilling Idea'?*, Corrections Magazine, June 1978, at 26, 27; Christianson, *Corrections Law Developments: Facilities Planning—Storm Over the "Olympic Prison"*, Criminal Law Bulletin, March-April 1979, at 162, 162–66.

**8.** Newspaper clippings of the following critical articles were admitted into evidence, without objection [The trial exhibit number is provided parenthetically as "Ex. ——."]: *Playing Games With Prisons*, N.Y. Times, Jan. 13, 1979 (apparently from the editorial page) [Ex. 6]; *"Olympic Jail" A Mistake*, St. L. Argus, Oct. 19, 1978 [Ex. 7]; *Lake Placid's 'Olympic Prison'*, The Downtowner (Syracuse, N.Y.), June 18, 1978, at 6 [Ex. 11]; Raspberry, *From Olympic Dormitory to Prison: Bad Idea?*, Washington Post, July 28, 1978 [Ex. 14]; *Beyond the Next Olympics*, Buffalo News, August 6, 1978, at E–2 (editorial) [Ex. 18]. The plaintiff also introduced a copy of *Bureau of Prisons Fiscal Year 1980 Authorization, Hearings Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary*, 96th Cong., 1st Sess. (1979) [hereinafter cited as "*Hearings*"], which contains critical testimony and reprints additional critical articles. *Id.* at 59–79.

has been S.T.O.P., which describes itself as an

association of religious, civil, and criminal justice reform groups created in 1978 for the purposes of organizing opposition to and increasing public knowledge about the construction of a federal prison for youthful offenders in Raybrook [*sic*], New York, and the use of that prison to house athletes gathered to participate in the 1980 Winter Olympic Games in Lake Placid, New York.

Complaint ¶ 3 (filed Oct. 5, 1978).

On August 15, 1978, F. Don Miller, the Executive Director of the U.S.O.C., wrote to S.T.O.P., requesting that it immediately "cease and desist from using the word 'Olympic' as well as . . . the Olympic rings on any material under [S.T.O.P.'s] control."[9] Miller asserted that S.T.O.P.'s poster violated the federal law governing the U.S.O.C., 36 U.S.C. § 379,[10] as well as Rule 6 of the Rules of the International Olympic Committee.[11]

S.T.O.P. refused to comply, and instead brought this suit against the U.S.O.C. for declaratory relief. S.T.O.P. seeks a judgment declaring that it and its members have rights protected by the first amendment "to print and distribute their poster," and "to the use of the word 'Olympic' and the symbol of the interlocking rings in expressing [their] opposition to the construction of the Raybrook [*sic*] prison." In addition, plaintiff seeks a declaration that its "use of the word 'Olympic' and the interlocking rings does not violate any trademark rights of the United States Olympic Committee and does not violate [the former section 379 of Title 36]." Complaint at 5.

Shortly thereafter, the U.S.O.C. counterclaimed for defamation, trademark infringement, and violation of New York's anti–dilution law.[12] Although the U.S.O.C. requested a preliminary injunction in its Answer and Counterclaim, it has never actively sought this relief, and consequently, the Court has not granted it.

The action was tried on September 13, 1979. Plaintiff called only one witness, Michael Kroll, an organizer and spokesman for S.T.O.P., and introduced several exhibits, consisting of numerous newspaper and magazine articles, and a transcript of congressional hearings on the fiscal year 1980 authorization for the Federal Bureau of Prisons. Defendant called no witnesses, but introduced without objection an affidavit of its Counsel, and copies of the registrations of various of its trademarks.

Throughout the proceedings, counsel for both sides threw bouquets at one another. S.T.O.P. asserted that it fully supported the U.S.O.C.'s efforts to raise money to support the United States' participation in the Olympic Games, and, moreover, that it wished to see the Olympic Village converted into a permanent training facility for Olympic athletes, rather than a prison. The U.S.O.C. acknowledged that S.T.O.P. has no intention of using the Olympic trademarks for profit, and that its only purposes are to publish its views and bring about a change in the plans for the subsequent use of the Olympic Village.

## DISCUSSION

### Jurisdiction

In attempting to uphold the Court's jurisdiction over the subject matter of this ac-

---

9. Complaint, Exhibit B.

10. Prior to the passage of the Amateur Sports Act of 1978, Pub. L. 95–606, 92 Stat. 3045 (Nov. 8, 1978), the federal charter for the U.S.O.C. provided criminal penalties for unauthorized use of word "Olympic" and the Olympic symbols and insignia. *See* note 15 *infra.*

11. Rule 6 of the International Olympic Committee prohibits unauthorized use of the Olympic symbols. *See* Complaint, Exhibit B.

12. Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
N.Y. Gen. Bus. L. § 368–d (McKinney 1968).

tion, the plaintiff asserts that it can be based upon the presence of a federal question, 28 U.S.C. § 1331(a), since the complaint makes first amendment claims against the defendant. Alternatively, plaintiff seeks to rely on defendant's status as an agency of the United States.

 Of these two proffered grounds, the latter is the more easily dismissed, since the defendant is by no means a federal agency. Furthermore, the U.S.O.C.'s incorporation by an Act of Congress, 36 U.S.C. § 371, does not provide a basis for jurisdiction under 28 U.S.C. § 1349,[13] since it is prohibited from issuing capital stock.[14]

 The first asserted ground is a bit more troublesome. In a declaratory judgment action, where the posture of the parties is often reversed, the issues raised in the complaint may be merely the defenses plaintiff would raise if the defendant were to bring a coercive action against it. *See, e.g., Public Service Comm'n v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952). And the existence of a federal question in a defense does not suffice to bring an action under the District Court's "arising under" jurisdiction, even if the plaintiff's complaint anticipates the defense and thereby incorporates the federal question. *See Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). As the Second Circuit recently stated:

> [A]n action for declaratory judgment may be brought in federal court ordinarily only if there would exist a basis for federal jurisdiction in a coercive action between the two parties.

*Warner-Jenkinson Co. v. Allied Chemical Corp.,* 567 F.2d 184, 186 (2d Cir. 1977) (citing *Public Service Comm'n v. Wycoff Co., supra; Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950)).

In the instant case, plaintiff's assertion of first amendment claims is solely as a defense to a possible coercive action by the defendant: in the absence of such a coercive action, or at least some threat of such action, the mere invocation of the first amendment would not suffice to create a justiciable controversy. Hence these claims do not provide a basis for jurisdiction, and the Court must therefore determine whether the plaintiff faced a sufficiently real threat of a coercive action by the defendant under federal law.

What complicates matters somewhat is that when S.T.O.P. filed its complaint in this action on October 5, 1978, the section of the U.S.O.C.'s federal charter governing unauthorized use of words and symbols associated with the Olympics was former section 379 of Title 36, which provided criminal penalties for such misuse.[15] The charter

---

**13.** The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock.

**14.** 36 U.S.C. § 378 (as amended 1978).

**15.** From and after September 21, 1950, it shall be unlawful for any person within the jurisdiction of the United States to falsely or fraudulently hold himself out as or represent or pretend himself to be a member of or an agent for the United States Olympic Committee or its subordinate organizations for the purpose of soliciting, collecting, or receiving money or material; or for any person to wear or display the insignia thereof for the fraudulent purpose of inducing the belief that he is at such time a member of or an agent for the United States Olympic Committee or its subordinate organizations. It shall be unlawful

for any person, corporation, or association, other than the United States Olympic Committee or its subordinate organizations and its duly authorized employees and agents for the purpose of trade, theatrical exhibition, athletic performance, and competition or as an advertisement to induce the sale of any article whatsoever or attendance at any theatrical exhibition, athletic performance, and competition or for any business or charitable purpose to use within the territory of the United States of America and its exterior possessions, the emblems of the United States Olympic Committee consisting of an escutcheon having a blue chief and vertically extending alternate red and white bars on the base with five interlocked rings displayed on the chief, or any other sign or insignia made or colored in imitation thereof, or the words "Olympic", "Olympiad", or "Citius Altius Fortius" or any combination of these words: *Provided, however,* That any person, corpo-

nowhere mentioned trademark protection. Then, in the Amateur Sports Act of 1978, 36 U.S.C. § 380(a) (as amended 1978), signed into law on November 8, 1978, Congress repealed the criminal penalties, and instead expressly provided for a civil action under the Lanham Act.[16] It is thus not entirely clear what type of coercive action the U.S. O.C. could have brought against S.T.O.P. as of the filing of the complaint.

■ The Court need not reach this question, though, for the complaint may be deemed amended and supplemented to refer to the Amateur Sports Act of 1978.[17] This would work no hardship on the defendant, since it expressly referred to this act in its Answer and Counterclaim.[18] Moreover, both parties addressed the defendant's Lanham Act claims at the trial and in their pre-trial memoranda.[19]

Amended as such, the complaint states a justiciable controversy. F. Don Miller's letter of August 15, 1978, requested that S.T. O.P. "immediately cease and desist from using the word 'Olympic' as well as utilization of the Olympic rings on any material under [S.T.O.P.'s] control." Complaint, Exhibit B. The letter then delivered the following warning: "Rest assured this office will take all steps that are necessary to insure compliance with the Law." *Id.* While it is true that the capitalization of the word "Law" suggests a specific reference to the former section 379, which was then in effect, and had been mentioned at an earlier point in the letter, there is every

reason to presume that the U.S.O.C. intended to use every legal means at its disposal to force S.T.O.P. to discontinue publishing and distributing its poster. When Congress replaced the criminal penalties with an express authorization of civil suits, the U.S. O.C. could not reasonably have been expected to abandon all efforts to see the former provision enforced, without vigorously employing the new statute to further its objectives.

Moreover, the complaint as amended raises a federal question, since it seeks a declaratory judgment as a defense to an anticipated federal action, one arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and under 36 U.S.C. § 380(a) (as amended 1978). Jurisdiction over defendant's counterclaim for trademark infringement may also be based on these statutes, but jurisdiction over the remaining counterclaims, may be based only on the principle of ancillary jurisdiction. *See Federman v. Empire Fire and Marine Insurance Co.*, 597 F.2d 798 (2d Cir. 1979):

### Exclusive Use Protection

As noted above, the Amateur Sports Act of 1978 replaced the criminal penalties for unauthorized use of Olympic symbols with a more comprehensive scheme of protection based upon the trademark laws. *See* 36 U.S.C. § 380. Subsection (a) of section 380 provides that:

Without the consent of the Corporation [U.S.O.C.], any person who uses for the purpose of trade, to induce the sale of

---

ration, or association that actually used, or whose assignor actually used, the said emblem, sign, insignia, or words for any lawful purpose prior to September 21, 1950, shall not be deemed forbidden by this chapter to continue the use thereof for the same purpose and for the same class or classes of goods to which said emblem, sign, insignia, or words had been used lawfully prior thereto. If any person violates the provision of this section he shall be deemed guilty of a misdemeanor, and upon conviction in any Federal court shall be liable to fine of not less than $100 or more than $500 or imprisonment for a term not exceeding 1 year, or both, for each and every offense.
Pub.L.No.805, c. 975, § 9, 64 Stat. 901 (repealed; formerly codified at 36 U.S.C. § 379).

**16.** The Lanham Act is also known as the Trademark Act of 1946, and is codified at 15 U.S.C. § 1051 *et seq.*

**17.** Fed.R.Civ.P. 15(b); *see Associated Gen'l Contractors of America, Inc. v. Local 612, Laborers Int'l Union*, 476 F.2d 1388, 1402 (Em.App.1973).

**18.** *See* Answer and Counterclaim at 1, 3. *See also* Affidavit of Patrick H. Sullivan at 1 (filed in court Sept. 13, 1979).

**19.** *See* Plaintiff's Memorandum at 6–18 (filed in court Sept. 13, 1979); Defendant's Memorandum in Support of Motion for Summary Judgment at 14–19 (filed in court Sept. 13, 1979).

any goods or services, or to promote any theatrical exhibition, athletic performance, or competition—

(1) the symbol of the International Olympic Committee, consisting of 5 interlocking rings;

(2) the emblem of the Corporation, consisting of an escutcheon having a blue chief and vertically extending red and white bars on the base with 5 interlocking rings displayed on the chief;

(3) any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee or the Corporation; or

(4) the words "Olympic", "Olympiad", "Citius Altius Fortius", or any combination or simulation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely suggest a connection with the Corporation or any Olympic activity;

shall be subject to suit in a civil action by the Corporation for the remedies provided in the Act of July 5, 1946 (60 Stat. 427; popularly known as the Trademark Act of 1946).

This subsection also contains a grandfather clause permitting continued use of any similar words and symbols used lawfully before September 21, 1950,[20] and subsection (b) permits the U.S.O.C. to license the protected words and symbols. Subsection (c) provides that:

The Corporation shall have exclusive right to use the name "United States Olympic Committee"; the symbol described in subsection (a)(1) of this section; the emblem described in subsection (a)(2) of this section; and the words "Olympic", "Olympiad", "Citius Altius Fortius" or any combination thereof subject to the preexisting rights described in subsection (a) of this section.

Notwithstanding the broad wording of subsection (c), it cannot be interpreted to mean that only the defendant and its licensees may use the word "olympic" and the enumerated symbols for any purpose whatsoever. Surely the news media are entitled to report about the Olympic competitions, which would almost of necessity entail use of the word "olympic" and photographs of the competition likely to contain some of the symbols. And, quite ironically, the Olympics and the U.S.O.C. have recently become a focus of international political controversy, generating public interest far exceeding the interest shown thus far in the concerns motivating S.T.O.P.[21] It is therefore necessary to determine the range of uses to which the U.S.O.C. may properly claim exclusive right under section 380.

Although numerous comparable statutes exist for other federally chartered corporations, relatively little case law has arisen.[22]

---

**20.** This is the date on which the former section 379 was enacted.

**21.** *See, e. g., Moscow Reaffirmed By Key Committee As Site of Olympics,* N.Y. Times, February 13, 1980, at 1, col. 6.

**22.** This Court could find only three cases under the twenty-eight sections of Title 36, United States Code, which give various patriotic organizations the "exclusive right to use" their names and various insignia, emblems, and the like: *Boy Scouts of America v. Teal,* 374 F.Supp. 1276 (E.D.Pa.1974); *Girl Scouts of United States of America v. Personality Posters Mfg. Co.,* 304 F.Supp. 1228 (S.D.N.Y.1969); *Girl Scouts of the United States of America v. Hollingsworth,* 188 F.Supp. 707 (E.D.N.Y.1960).

The *Teal* and *Hollingsworth* cases had no occasion to test the boundaries of the statutes. Each involved an unauthorized use of the word "Scout" and its variations in a manner likely to lead to confusion with the plaintiff organizations. *See* 374 F.Supp. at 1279, 1281; 188 F.Supp. at 715.

The well-known *Personality Posters* case, however, is somewhat more akin to the instant case. It involved a poster published by the defendant:

of a smiling girl dressed in the well-known green uniform of the Junior Girl Scouts, with her hands clasped above her protruding, clearly pregnant abdomen [with] [t]he caveat "BE PREPARED" . . . next to her hands.

304 F.Supp. at 1230. The plaintiff contended that the poster violated 36 U.S.C. § 36, which grants to the Girl Scouts "the sole and exclusive right to have and to use, in carrying out its purposes," various emblems, badges, words and phrases. Judge Lasker of this district noted that:

But from the few reported cases, and the similar wording of nearly all of these statutes,[23] it appears that Congress' objective has been to prevent the deceptive or confusing use of these corporations' mottoes, emblems, and the like by unauthorized persons. Given the degree of familiarity with many of the symbols in question, such unauthorized use, even in connection with wholly unrelated goods or services, would almost certainly convey the false impression of endorsement or sponsorship.

There is no indication that Congress meant to treat the U.S.O.C. and its protected symbols any differently.[24] Indeed, section 380, read as a whole, evidences a legislative intent to establish strong protection for the Olympic symbols, in part to ensure the market value of licenses for their use. Recent experience has shown such licensing to be a substantial inducement for contributions from a wide variety of commercial corporations,[25] and the drafters of subsection (b) appear to have had this clearly in mind.

In this setting, subsection (c) appears to have been designed to prevent all persons other than the U.S.O.C. from registering the Olympic words and symbols as trademarks or service marks in connection with any types of goods or services whatsoever, rather than as a blanket prohibition of all

---

the purpose of Congress in incorporating the Girl Scouts was only to bestow public honor and recognition on the works of the organization, not to protect it inviolable from the lampooning use of its name, motto and insignia.

304 F.Supp. at 1232. Then, relying largely on the qualifying phrase, "in carrying out its purposes," he held that Congress intended section 36:

only to protect the public and the Girl Scouts from the confusing or illegitimate use of plaintiff's symbols by those who might compete with it in its normal purposes and endeavors.

*Id.*

In another case, *Adolph Kastor & Bros. v. FTC*, 138 F.2d 824 (2d Cir. 1943), the Second Circuit declined to consider the significance of the exclusive use statute for the Boy Scouts, 36 U.S.C. § 27, to the petitioner's sale of "Scout Knives." *Id.* at 826.

**23.** *Compare* 36 U.S.C. § 380(c) (as amended 1978) *with, e. g.,* 36 U.S.C. § 27 (Boy Scouts); 36 U.S.C. § 36 (Girl Scouts); 36 U.S.C. § 477 (National Safety Council); 36 U.S.C. § 895 (as amended 1977) (Big Brothers, Big Sisters); 36 U.S.C. § 1086 (Little League).

**24.** Very little of the Congressional debates on the Amateur Sports Act centered on section 110, which is now codified as 36 U.S.C. § 380, since Congress at the time primarily focused on the propriety of making the U.S.O.C. a national governing body for amateur sports, and of expending $30 million to do so. *See, e. g.,* 124 Cong.Rec. H10,743 (daily ed. Sept. 26, 1978) (remarks of Rep. Danielson). The few references to section 110 suggest that Congress viewed its essential purpose as providing the U.S.O.C. the power to protect the various words and symbols by a civil action under the Lanham Act. *See id.* at H10,743; *id.* at H10,-754 (remarks of Rep. Moorhead). The House

Report accompanying the bill further indicates that Congress desired to prevent all uses of the words and symbols which would falsely suggest a connection with the International Olympic Committee or the U.S.O.C. *See* H.R.Rep. No. 95–1627, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 7478, 7488.

Somewhat analogous to the federal exclusive use statutes is section 397(1) of New York's General Business Law (McKinney 1968), which provides:

No person, firm, association or corporation shall use, for advertising purposes or for purposes of trade, the name, symbol, device or other identification of any non-profit corporation, association, society or organization organized exclusively for religious, benevolent, humane, charitable, educational, hospital, patriotic, fraternal or veterans purposes or to promote the study or the advancement of the arts or sciences or to sustain, encourage or promote the musical or performing arts, without having first obtained the written consent of such nonprofit corporation, association, society or organization.

In the only New York case construing this statute, the court held that it "was mainly designed to operate in connection with the sale of goods and services," and that the use of the name "Notre Dame" in a motion picture parodying college football was outside the statute's proscription. *University of Notre Dame Du Lac v. Twentieth Century-Fox Film Corp.,* 22 A.D.2d 452, 456, 256 N.Y.S.2d 301, 305 (1st Dep't 1965), *aff'd mem.,* 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965); *accord, Girl Scouts v. Personality Posters, supra,* 304 F.Supp. at 1234–35.

**25.** Even this practice has its critics, however. *See* Bajak, *Olympics For Sale,* N.Y. Times, Jan. 22, 1980, at 21.

uses whether commercial or not. What little legislative history there is about this subsection supports this conclusion.[26]

█ In light of the Congressional purpose, therefore, the Court concludes that plaintiff's poster is a violation of neither subsection (a) nor subsection (c) of section 380. The poster was not used "for the purpose of trade," or "to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition." None of the posters have been sold or distributed commercially, and they are available free of charge. As noted above, only a relative few were sold by the defendant, and the money paid for each appears to have been more in the nature of a contribution to S.T.O.P. than a purchase price.[27]

*Trademark Infringement*

Apart from the Amateur Sports Act, the dispute between the parties involves claims of trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and of trademark dilution and disparagement under state law, *see* N.Y.Gen.Bus. Law § 368–d (McKinney 1968). The parties agree that the defendant is the owner of various registered trademarks, including the word "olympic,"[28] the five interlocking "Olympic rings," and the "Olympic torch."[29] Moreover, they agree that the plaintiff's poster contains this word and these symbols.

█ "The touchstone of trademark infringement under the Lanham Act . . . is 'likelihood of confusion.'" *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Although "confusion" in this context has traditionally meant confusion as to the source or origin of goods or services in connection with which a trademark is used,[30] courts have come to accept confusion as to sponsorship, endorsement, or some other affiliation as satisfying the require-

---

**26.** Subsection (c) was added at the suggestion of the Commissioner of Patents and Trademarks, who was concerned that its omission in the new bill would undercut the Patent and Trademark Office's authority to refuse all registrations of the Olympic words and symbols. Under the former section 379, the Office had refused registration on the ground that "unlawful use is not use from which trademark rights can be acquired." H.R.Rep. No. 95–1627, 95th Cong., 2d Sess. 38, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 7478, 7496 (letter from Donald W. Banner, Commissioner of Patents and Trademarks, to Hon. George E. Danielson, Chairman, Administrative Law and Governmental Relations Subcommittee, House Judiciary Committee, Sept. 12, 1978). The Commissioner noted that without an exclusive use provision,

the Patent and Trademark Office could only refuse registration of a designation listed in section 110(a) [36 U.S.C. § 380(a) (as amended 1978)] on the basis of confusion [*sic*; probably should be "confusing"] similarity with an existing trademark, deception, or false suggestion of a connection with an institution. All of these grounds require a consideration of the goods or services involved which the present bill does not contemplate. *Id.*

**27.** Even were the Court to find that the sales of the poster violated the defendant's rights, the most relief that it should grant would be an injunction against sales, not against all distribution of the poster.

**28.** This was registered by the Patent Office on September 18, 1973, as a trademark, service mark and collective membership mark, for use on, among other things, uniforms and equipment used in connection with track and field games, jewelry, glassware, paper items, pamphlets, books, souvenirs, and "advertisements' to raise money to support the Olympic Games." U.S.P.O. Registration No. 968,566 (Sept. 18, 1973) [admitted into evidence as Defendant's Exhibit A, Exhibit A].

**29.** Both the torch and the rings appear prominently as part of an emblem registered to the defendant as a trademark, service mark and collective membership mark for use on similar items. U.S.P.O. Registration No. 980,734 (March 26, 1974) [admitted into evidence as Defendant's Exhibit A, Exhibit B].

**30.** *See, e. g., American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir. 1979); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

ment.[31] Confusion is not an essential element of a cause of action under the Lanham Act, however, since the Act expressly proscribes false advertising and deceptive use of trademarks as well.[32] And, although trademark dilution and disparagement are technically within the province of state law,[33] courts sometimes consider these types of injuries in the context of Lanham Act claims.[34] The Lanham Act was not, however, intended to prohibit all uses of a trademark by persons other than its owner.[35]

For the purpose of deciding the questions presented here, the Court perceives no need to map the boundaries of federal trademark protection. On the peculiar facts presented, the Court simply concludes that the defendant has failed to establish its entitlement to an injunction, since it has proven no injury of any of the types catalogued above.

The defendant has offered no evidence whatsoever of public confusion as to source or origin, or as to sponsorship, endorsement, or any other affiliation. Defendant has produced no affidavits, letters, or other communications from any person who believed the poster to have been sponsored or endorsed by, or in any way connected with, the U.S.O.C., the L.P.O.O.C., or any other organization or persons associated with the Olympics.[36] Nor has the defendant undertaken to produce any surveys of public perception of plaintiff's poster.[37] In fact, defendant has described not even one incident from which confusion might be inferred.

The defendant argues that proof of actual confusion is unnecessary to establish trademark infringement, "as long as such confusion is the 'likely' result of the infringing activities." Defendant's Memorandum at 16–17 (filed in court on Sept. 13, 1979). But while the absence of proof of actual

**31.** *See, e. g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir. 1979); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976); *Professional Golfers Association v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir. 1975).

**32.** 15 U.S.C. §§ 1114(1)(a), 1125(a); *see American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 164–65 (2d Cir. 1978).

**33.** *See, e. g., R. G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, at 657 (2d Cir. 1979); *Fur Information & Fashion Council v. E. F. Timme & Son, Inc.*, 501 F.2d 1048, 1051–52 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974).

**34.** *See Dallas Cowboys Cheerleaders, supra,* 604 F.2d at 205 (unauthorized use of uniform of Dallas Cowboys Cheerleaders in pornographic film found to cause "confusion which has 'a tendency to impugn'"); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975) (unauthorized manufacture of embroidered emblems of professional hockey teams held likely to confuse because the buying public would know "that the source and origin of the trademark symbols were in plaintiffs"); *Chemical Corp. v. Anheuser-Busch, Inc.*, 306 F.2d 433, 439 (5th Cir. 1962), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963) (unauthorized use of "Where there's life . . . there's Bugs" held to infringe plaintiff's rights

in "Where there's life . . . there's Bud"); *Gucci Shops, Inc. v. R. H. Macy & Co.*, 446 F.Supp. 838, 840 (S.D.N.Y.1977) (Lanham Act protected plaintiff's mark "Gucci" from ridicule by defendant's unauthorized sale of "Gucchi Goo" diaper bags); *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y. 1972) ("Enjoy Cocaine" poster found to associate plaintiff's product with noxious substance so as to "have a tendency to impugn that product and injure plaintiff's business reputation"). *See generally* 2 J. McCarthy, *Trademarks and Unfair Competition* § 24:15 (1973 & Supp. 1979).

**35.** For example, several sources suggest that registered trademarks may legally be used without the consent of the owner in comparative advertising. *See R. G. Smith v. Chanel, Inc.*, 402 F.2d 562, 565–66 (9th Cir. 1968); *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962); *Ringling Bros.-Barnum & Bailey Comb. Shows, Inc. v. Chandris America Lines, Inc.*, 321 F.Supp. 707, 711–12 (S.D.N.Y.1971). *See generally Comparative Advertising*, 67 Trademark Rep. 351–418 (1977) (collection of articles).

**36.** Compare the evidence adduced in *Coca-Cola Co., supra*, 346 F.Supp. at 1189 n.9.

**37.** *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1340–41 (2d Cir. 1975).

confusion is not determinative, "since such proof may be difficult to obtain," *Mushroom Makers, supra,* 441 F.Supp. at 1231, it is significant,[38] especially since in the instant case, there is little else. The poster itself contains a legend indicating its sponsors.[39] The defendant has proven no improper intent on the part of the plaintiff to "palm off" its poster, to confuse or deceive anyone, to misappropriate the defendant's marks for its own profit, or even to impugn the defendant. Nor has the defendant shown an actual injury of any sort.[40]

■ On the basis of its own examination of the poster, the Court finds it extremely unlikely that anyone would presume it to have been produced, sponsored or in any way authorized by the U.S.O.C. While at a fleeting glance, someone might conceivably mistake it for a poster advertising the Olympics, nobody could conceivably retain such a misconception long enough to do any harm: for example, there is no danger that anyone would purchase or display it as such. Under the circumstances, therefore, the Court concludes that the defendant has failed to meet its burden of proving trademark infringement. *See American Footwear Corp. v. General Footwear Co., supra,* 609 F.2d at 664–65. Injunctive relief cannot be granted on pure speculation.

■ Similarly, the plaintiff has produced no evidence of trademark dilution. "Dilution" in this context refers to a loss of distinctiveness, a weakening of a mark's propensity to bring to mind a particular product, service, or source of either.[41] Likelihood of confusion is therefore unnecessary to a finding of dilution. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 544–45, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165 (1977). In a sense then, the New York anti-dilution law, N.Y.Gen.Bus. Law § 368–d (McKinney 1968), attempts to provide for strong marks[42] the type of exclusive use protection afforded to the U.S.O.C. by 36 U.S.C. § 380.

But just as S.T.O.P.'s poster does not violate the latter of these statutes, it does not violate the former. Since the poster is not likely to be viewed as a commercial advertisement, there is no danger that it will induce anyone to associate the word "olympic" or the Olympic symbols with any goods or services not provided, sponsored or endorsed by the U.S.O.C. Nor does it appear likely that it will induce viewers to associate them with S.T.O.P. or its constituent members in such a way that it weakens their propensity to bring to mind the Olympic Games or the U.S.O.C. Accordingly, the Court declines to find that plaintiff's poster has a diluting effect on defendant's marks.

*Disparagement*

It seems that the defendant's real concern here is that the poster will cause the public to associate the Olympic Games and the U.S.O.C. with a federal prison. According to the defendant, this is a false infer-

---

**38.** "Although the Lanham Act speaks of the 'likelihood of confusion,' . . . it is certainly proper . . . to infer from the absence of actual confusion that there was also no likelihood of confusion." *Affiliated Hospital Products, Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975).

**39.** *See Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 759 (9th Cir. 1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979); *Girl Scouts v. Personality Posters, supra,* 304 F.Supp. at 1231. *But see Coca-Cola v. Gemini Rising, supra,* 346 F.Supp. at 1189.

**40.** The defendant speculates that the poster might deter corporations and individuals from making contributions in support of the Olympics. *See* Affidavit of Patrick H. Sullivan at 5 (filed in court Sept. 13, 1980). Yet the defend-

ant has offered no evidence of diminished contributions, or even of one potential contributor's objection to the poster.

**41.** *See generally* 2 J. McCarthy, *supra* note 34, § 24:13.

**42.** In *Allied Maintenance,* the Court of Appeals held that "only those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public should be entitled to protection under the anti-dilution statute." 42 N.Y.2d at 546, 399 N.Y.S.2d at 633, 369 N.E.2d at 1166. Three judges dissented on this point. *See id.* at 546–50, 399 N.Y.S.2d at 633–36, 369 N.E.2d at 1166–69 (Cooke, J., dissenting).

ence, because the U.S.O.C. had nothing to do with the decision to construct a prison at Ray Brook, N. Y., or to permit its use by the Olympic athletes during the 1980 Winter Olympics. While the defendant apparently concedes that the decision to house the athletes at the prison was made by the L.P.O.O.C., it maintains that "[t]he Lake Placid Olympic Organizing Committee is a corporation separate and apart from, and is not subject to the control of, the U.S.O.C." Answer and Counterclaim at 5.

■ Whether this particular claim is considered to be one for deception under the Lanham Act, *see* 15 U.S.C. §§ 1114(a), 1125, or for disparagement under state law, the result is the same, since the defendant has failed to prove that the plaintiff's poster is false or misleading, or in any way impugns the U.S.O.C. The Court agrees that the poster implies some connection between the Olympic Games and the Ray Brook federal prison, but even the defendant acknowledges that such a connection exists, since Olympic athletes will be housed there. Beyond that, if the poster implicates the U.S.O.C., it is only because the facts themselves do. The poster, by its use of the Olympic symbols and the word "olympic," no more suggests the U.S.O.C.'s involvement with the prison than recent cartoons associating the Olympic symbols with tanks suggest its participation in the Soviet Union's military presence in Afghanistan.[43]

■ Although the Lanham Act "encompasses more than literal falsehoods," and protects against "sophisticated deception" as well, *American Home Products Corp. v. Johnson & Johnson, supra,* 577 F.2d at 165, the burden remains on the party making the claim to prove a tendency to mislead or deceive. *See American Brands, Inc. v. R. J. Reynolds Tobacco Co.,* 413 F.Supp. 1352, 1357 (S.D.N.Y.1976). And, to paraphrase Judge Lasker in the *American Brands* case, the crucial question is: what would a person viewing the poster find to be the mes-

sage? *Id.* at 1357; *accord, American Home Products, supra,* 577 F.2d at 166. On this question, the defendant has presented no proof at all.

■ Moreover, the Court seriously doubts that the Lanham Act applies to the type of deception alleged by the defendant here. In the first place, there is no suggestion that the alleged deception was in connection with any goods or services. *Cf. Fur Information & Fashion Council v. E. F. Timme & Son, Inc.,* 501 F.2d 1048, 1051 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974) (interpreting 15 U.S.C. § 1125(a)). Second, and more important, the Lanham Act should not be construed in a manner that would bring it into conflict with first amendment interests. As Judge Brieant observed in the *Fur Information* case in the District Court:

> While Congress may limit [first amendment] rights to prevent fraud, copyright infringement or palming off, such limitation must be drawn narrowly, so as to meet the perceived evil, without unnecessary impingement on the right of free speech.

364 F.Supp. 16, 22 (S.D.N.Y.1973), *aff'd on other grounds,* 501 F.2d 1048 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974).[44]

■ Finally, to the extent that defendant's claim can be considered one for libel under state law, it must be rejected on several grounds. First, and most important, the defendant has failed to demonstrate anything approaching the circumstances that might justify a court of equity's enjoining even libelous printed material. As Judge Pollack of this district so concisely stated more than a decade ago:

> A court of equity will not, except in special circumstances, issue an injunctive order restraining libel or slander or otherwise restricting free speech.
>
> To enjoin any publication, no matter how libelous, would be repugnant to the

---

**43.** *See* Time, January 28, 1980, at 15 (cartoon by Wright, reprinted from Providence Journal-Bulletin) [appended hereto as Appendix B].

**44.** The Court of Appeals reversed the district court's findings of false description and misrepresentation, and consequently did not reach the first amendment issue. 501 F.2d at 1050–53.

First Amendment to the Constitution, and to historic principles of equity.

*Konigsberg v. Time, Inc.*, 288 F.Supp. 989, 989 (S.D.N.Y.1968) (citations omitted); *see Girl Scouts of United States of America v. Personality Posters Mfg. Co.*, 304 F.Supp. 1228, 1234 (S.D.N.Y.1969).

Second, the court finds that on the issue of whether Olympic athletes should be housed in a facility destined to become a prison, the U.S.O.C. is enough of a public figure to require it to prove "actual malice" in order to recover for libel. *See, e. g., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 ·(1967). The U.S.O.C. has statutory responsibilities to "establish national goals for amateur athletic activities," and to "exercise exclusive jurisdiction . . . over all matters pertaining to the participation of the United States in the Olympic Games . . . *and over the organization of the Olympic Games . . . when held in the United States.*" 36 U.S.C. § 374(1), (3) (as amended Nov. 8, 1978) (emphasis added). Thus, it would appear that it is statutorily obliged to "thrust" itself and its views, *see Wolston v. Reader's Digest Ass'n,* 443 U.S.

157, 165, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire,* 443 U.S. 111, 133–136, 99 S.Ct. 2675, 2687–88, 61 L.Ed.2d 411 (1979), into public controversies that involve "goals for amateur athletic activities" and "the organization of the Olympic Games when held in the United States," such as the issue which motivates the plaintiff. Moreover, the U.S.O.C. appears to have had "regular and continuing access to the media," *see Hutchinson, supra,* 443 U.S. at 136, 99 S.Ct. at 2688, on matters involving the Olympics.

Not only has the defendant failed to prove that the plaintiff published its poster with "knowledge that it was false or with reckless disregard of whether it was false or not," *see New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), the defendant has not even proven that it was uninvolved in the decision to house the athletes in the prison. · In fact, the defendant introduced no proof at all on this issue.[45] Given its responsibility for organization of the Games in the United States, it does not seem unreasonable to infer that it, or an organization to which it had delegated such responsibility, played an important part.[46]

---

**45.** The only evidence on this question is an affidavit by defendant's "Counselor," introduced at trial, which states that:

> the USOC is in no way connected or associated with the construction of the prison facility for youthful offenders in Raybrook [*sic*], New York, a facility that is now fully constructed. It neither requested the United States Bureau of Prisons to construct the facility nor has it in any way contributed financially or otherwise to the construction of this prison. Indeed, the USOC has exercised no influence whatsoever as to whether or where this facility would be constructed.

Affidavit of Patrick H. Sullivan at 6 (filed in court Sept. 13, 1979).

**46.** During the Hearings on the Bureau of Prisons' Fiscal Year 1980 Authorization, the Director of the Bureau of Prisons, Norman Carlson, testified about the controversy surrounding the Ray Brook facility.

> [T]he Lake Placid institution was not a site that we had selected outselves [*sic*]. We were, however, looking for sites in the Northeast region for an institution to serve the youthful population that is now scattered

throughout many institutions far removed from that region. . . .

> At the time we were looking for sites there was an attempt to develop Olympic Village at Lake Placid to serve the needs of the Olympic Committee for 1980. We were asked if there was a possibility that the Bureau of Prisons could utilize that facility after the Olympics were completed.

*Hearings, supra* note 8, at 10. Subsequently, when asked whether the Bureau of Prisons determined the architecture of the Ray Brook facility, Carlson responded: "Yes. We had excellent cooperation from the Olympic Committee and from the Department of Commerce, who were responsible for the entire Olympic project." *Id.* at 11. A short time later in the hearing, Carlson was asked who brought up the idea of locating a prison in Lake Placid. He replied:

> The Olympic Committee, as I recall, were the ones who were trying to find a secondary use for the Olympic Village. That was one of the problems they had in developing the Olympic complex for 1980, and representatives of the Lake Placid Organizing Commit-

Finally, it is debatable whether an association between the U.S.O.C. and the decision to convert the athletes' housing into a prison after the Games would in any way injure the U.S.O.C. Since at least some people view the plan as a wise and economical use of taxpayers' money,[47] the Court cannot conclude that the poster is libel per se. Consequently, the defendant must plead and prove special damages, which it has not done. *See, e. g., Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 458, 280 N.Y.S.2d 641, 643–44, 227 N.E.2d 572, 573–74 (1967); *Cohn v. National Broadcasting Co.*, 67 A.D.2d 140, 146, 414 N.Y.S.2d 906, 909 (1st Dep't 1979).

*First Amendment*

It is therefore unnecessary to address the plaintiff's claim that it has rights, in the abstract, under the first amendment, to print and distribute its poster. It is worth recalling, however, *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), a case that involved our most revered federally protected symbol. There, the Supreme Court held that a college student's public display of an upside-down American flag, to which he had affixed a peace sym-

bol, was a form of expression protected by the first amendment. Expressly rejecting Mr. Justice Rehnquist's analogy to *Halter v. Nebraska*, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696 (1907), which upheld prohibiting representations of the flag on beer bottles, the Court stated:

> There was no risk that appellant's acts would mislead viewers into assuming that the Government endorsed his viewpoint. To the contrary, he was plainly and peacefully protesting the fact that it did not.

418 U.S. at 414–15, 94 S.Ct. at 2732.[48]

### CONCLUSION

Accordingly, since the defendant has failed to prove its counterclaims, they are dismissed. The plaintiff is entitled to a Judgment declaring that its poster does not violate section 380 of Title 36, United States Code, or infringe any of the defendant's trademark rights.

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Submit Judgment on Notice.

SO ORDERED.

tee did approach us and asked if we'd consider that as an alternative.
*Id.* at 17.

**47.** *See Hearings, supra* note 8, at 43–44, 45–47; *Report on Olympic Winter Games Authorization Act*, H.R.Rep. No. 94–1167, 94th Cong., 2d Sess. 3, 6 (1976); *Plan to Convert Olympic Buildings Into Prison Assailed*, N.Y. Times,

May 15, 1978, at B3 [Ex. 12]; *Ripples across Lake Placid*, Boston Globe, June 19, 1978 [Ex. 17].

**48.** *Accord, Long Island Vietnam Moratorium Committee v. Cahn*, 437 F.2d 344 (2d Cir. 1970), *aff'd mem.*, 418 U.S. 906, 94 S.Ct. 3197, 41 L.Ed.2d 1153 (1974).