**USA NETWORK, Plaintiff,**

v.

**GANNETT CO., INC., and Combined Communications Corporation, Defendants.**

**Civ. A. No. 84–JM–522.**

United States District Court, D. Colorado.

March 30, 1984.

Robert C. Dorr, Burton & Dorr, Denver, Colo., Gerald Harris, Martin P. Michael, Rubin, Baum, Levin, Constant & Friedman, New York City, for plaintiff.

Josephine R. Weirich, Andrew M. Low, Davis, Graham & Stubbs, Denver, Colo., for defendants.

## MEMORANDUM OPINION
## AND ORDER

JOHN P. MOORE, District Judge.

THIS MATTER is before me on the motion of plaintiff USA Network for a preliminary injunction. The plaintiff seeks to enjoin defendants Gannett Co., Inc., and Combined Communications Corp. from changing the call letter of its Denver-based broadcast television station from KBTV (Channel 9) to KUSA–TV. The complaint alleges counts for trademark infringement in violation of 15 U.S.C. § 1114(1), false designation in violation of 15 U.S.C. § 1125(a), and pendent state law claims for unfair competition and misappropriation. Jurisdiction lies pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1131 and 1338(a).

## I.

The standard for entry of a preliminary injunction requires that plaintiff establish four elements in connection with the relief sought: (1) a substantial likelihood that it will prevail on the merits of its claims; (2) that irreparable injury will result if the injunction is not granted; (3) that the injury to plaintiff outweighs the harm caused by granting the injunction; and (4) that the injunction will not be harmful to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61 (10th Cir.1980).

Having carefully considered the briefs and arguments of counsel and the evidence presented to me, I have concluded that plaintiff has not met this heavy burden and that the motion for preliminary injunction must be denied.

## II.

This action is somewhat unique because it raises a question of whether and to what extent call letters employed by a single broadcast television station in the Denver market can infringe upon a trademark or marks of a nationwide television network which disseminates its programming through cable linkage. To perceive the nature of the issues, one must understand the contrasting and similar ways in which the two parties do business.

It is without question that each entity exists to provide entertainment, education, and sports programming to the viewing public. It is only in the manner in which the programming is delivered that the physical operations are different. While the plaintiff sells its programming to affiliates who in turn sell a package of programming to subscribers, the defendants simply beam a signal through the public airways to all potential viewers within the broadcast area. Unlike cable viewers who are dependent upon a cable connection to the programming source and who must subscribe to and pay for cable programming, broadcast viewers need only turn on their sets to receive programming.

It is without question that because USA Network is dependent upon its affiliated cable operators for dissemination of its product, the affiliates form a market for plaintiff which is foreign to Channel 9. Indeed, in contrast to significant revenues derived by the plaintiff from sales of its programming to its affiliates, Channel 9 receives nothing for the actual transmission of its television signal.

Notwithstanding, both entities derive the major portion of operating revenues from the sale of broadcast time to advertisers. In the sense that this advertising time is the stock in trade for both parties, it is clear that advertising is the "product" sold by both.

The history of both entities is also dissimilar. Plaintiff has been in existence since 1980, but it has sustained a rapid growth in revenues, affiliates, and subscribers over the past four years. In order to stimulate that growth, USA Network has already spent nearly $12 million in advertising, and it has budgeted $4 million for that purpose in 1984. Additionally, USA Network has used its own air time, which it values at $30 million, for promotion of its programming.

Channel 9 has been in existence since 1952, but for its first 20 years, it was not a highly regarded station in the Denver market. However, within the last 12 years, it too has sustained a growth in stature so that it now occupies a position of prominence in the community.

From its inception to the present date, Channel 9 has used the call letters KBTV, but in order to dramatize management's perception of the station as a citizen of the Denver community, rather than just as a programming source, the defendants sought permission from the Federal Communications Commission to change the station's call letters to KUSA–TV. Permission was granted on February 3, 1984, and Channel 9 commenced the process of converting to its new name.

As part of the process, defendants adopted a new logo consisting of a stylized large blue "9" followed by slanted blue block letters "KUSA." In order to avoid

the pronunciation of the logo as the word "koosah," the designer of the logo incorporated a star which is superimposed over the space between, and the edges of, the letters "K" and "U." The completed logo is underlined by what appears as a broad red, white, and blue stripe.

In contrast is the logo of the plaintiff. In its most common aspect, the logo consists of slanted red bold block letters "USA" subscripted by smaller blue block letters spelling "CABLE NETWORK."

Both entities employ an alternative logo. Channel 9 will add a hyphen and the blue block letters "TV" after its logo, and it will subscript a blue "DENVER" in thinner block letters beneath the stripe. Plaintiff simply uses the large red block "USA" subscripted by the word "NETWORK" in smaller blue block letters.

It is Channel 9's proposed use of the two logos which plaintiff asserts infringes upon its trademark. Additionally, as I perceive the argument, it is argued that the use of the letters "USA" as part of the Channel 9 call letters will work the same result. It is within this factual framework that the legal issues are to be decided.

## ˆ III.

■ The policy rationale for legal protection of trademarks is closely related to the functions served by trademarks. Both are two-fold: to grant a trademark owner protection of the good will that is symbolized by his trademark [1] and to protect the public from confusion, deception, and mistake occasioned by the use of similar marks.[2] Consistent with this rationale, in order to establish trademark infringement, a plaintiff must prove the validity of the mark it seeks to protect and must also prove that the use of a similar mark by defendant is "likely to cause confusion in the market place concerning the source of the different products." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940, *citing Vitek Systems, Inc. v. Abbott Laboratories*, 675 F.2d 190, 192 (8th Cir.1982). The word "likely" has been interpreted by the Tenth Circuit Court of Appeals to mean "probably," not possibly. *Drexel Enterprises, Inc. v. Richardson*, 312 F.2d 525, 528 (10th Cir.1962).

■ The registration of plaintiff's "USA Network" mark is prima facie evidence of its exclusive right to use the mark as registered in connection with services stated in the registration.[3] 15 U.S.C. §§ 1057(b) and 1115(a). The marks claimed by plaintiff in "USA" and "USA Cable Network" are not registered. Accordingly, plaintiff must establish the common law validity of trademarks in these names in order to maintain an action for infringement. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1370 (10th Cir.1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

■ Defendants urge that common law trademarks in the "USA" and "USA Cable Network" marks have not been established because USA is a geographically descrip-

---

**1.** As explained by the Supreme Court in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916),

The redress that is accorded in trade-mark cases is based upon the party's right to be protected in the good-will of a trade or business.... Where a party has been in the habit of labeling his goods with a distinctive mark, so that purchasers recognize goods thus marked as being of his production, others are debarred from applying the same mark to goods of the same description, because to do so would in effect represent their goods to be of his production and would tend to deprive him of the profit he might make through the sale of the goods which the purchaser intended to buy. Courts afford redress or relief upon the ground that a party has a valuable interest in the good-will of his trade or business, and in the trade-marks adopted to maintain and extend it. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another.

**2.** *See, e.g., Metropolitan Life Ins. Co. v. Metropolitan Ins. Co.*, 277 F.2d 896, 900 (7th Cir.1960); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976).

**3.** The Service Mark "USA Network" was registered on July 13, 1982, for "Entertainment Services—namely, providing programs for cable television...." *See* exhibit "A" to the complaint.

tive term that has not attained secondary meaning with respect to plaintiff and its product. A geographically descriptive term is not subject to legal protection unless it has attained "secondary meaning" by becoming "distinctive." 15 U.S.C. § 1052(f); *Big O Tire Dealers*, 561 F.2d at 1370. Secondary meaning has been achieved when a descriptive word has been used so long and so exclusively by one producer with reference to its goods that the public understands the mark to designate a particular manufacturer. *Educational Development Corp. v. Economy Co.*, 562 F.2d 26 (10th Cir.1977). It is not necessary to show that the public is aware of the name of the manufacturer, "it is sufficient if the public is aware that the product comes from a single, though anonymous, source." *Beer Nuts*, 711 F.2d at 940.

Plaintiff counters that the secondary meaning issue need not be reached in this case because Channel 9's use of the call letters KUSA would infringe on plaintiff's registered trademark of "USA Network." Plaintiff goes on to argue that assuming it was required to prove secondary meaning to maintain this action, it has done so through the introduction of evidence concerning plaintiff's extensive advertising efforts and its rapid rate of growth.

I note initially that there is some question regarding whether proof of advertising and growth may definitively establish secondary meaning. Several courts have held such evidence to be only a measure of an effort to establish secondary meaning, but not determinative as to the result of those efforts. *Flavor Corp. of America v. Kemin Industries, Inc.*, 493 F.2d 275, 181 U.S.P.Q. 289 (8th Cir.1974); *Walt-West Enterprises, Inc. v. Gannett Co., Inc.*, 695 F.2d 1050 (7th Cir.1982), *cert. denied*, 459 U.S. 837, 103 S.Ct. 83, 74 L.Ed.2d 78 (1982); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845 (5th Cir.1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970). I need not, and do not, reach the issue at this juncture in the case, however, because I find a more serious defect in plaintiff's case; namely, its failure of proof on the confusion issue.

Even assuming that plaintiff has established valid trademarks in all three of its claimed names, I find that plaintiff has not established that defendants' proposed mark is so similar in appearance, meaning, effect, or use to the marks used by plaintiff to create a realistic likelihood of confusion in the minds of the relevant purchasing public. Where there is no confusing similarity, there can be no infringement. *Beer Nuts*, 711 F.2d at 940; *Vitek Systems*, 675 F.2d at 192.

The test to be applied in measuring the likelihood of confusion has been set out in *Beer Nuts*. While suggesting criteria for the test, the court makes clear that each case must be decided on its own, and no one factor is determinative. Yet, the seminal factor to be considered is the degree of similarity between the defendant's proposed mark and the plaintiff's trademark in appearance, pronunciation of words used, verbal translation of the pictures or designs involved, and suggestion. A second relevant factor is the intent of the defendant in adopting the proposed mark. Plaintiff need not prove a wrongful intent on the part of the defendant, it need only establish a likelihood of confusion. Where lack of good faith is argued or proven, however, it is a factor to be weighed in the determination of whether there is a likelihood of confusion. *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980); *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 446 (9th Cir.1980). The third consideration is the relation in use and manner of marketing between the products represented by the similar marks, and a fourth, the degree of care likely to be exercised by purchasers of the product.

The test for measuring a likelihood of confusion must be applied to the relevant purchasing public and not to a hypothetical public. In applying the test, the court must place itself in the shoes of the consumer of the product and then ask,

when buying under the usual conditions, whether the source of the product would be confused, or whether the consumer would believe that plaintiff and defendant are in some way connected or that plaintiff is the sponsor of defendant. Because a consumer is ordinarily not able to compare trademarks side by side, but instead is apt to compare one mark with his recollection of the other mark, the court should gauge the potential for confusion in defendant's mark as it is singly presented. In sum, the marks must be compared in terms of what occurs in the marketplace and not in the courtroom. *Beer Nuts*, 711 F.2d at 941.

In this case, I have determined that the relevant public to which the confusion test is properly applied is composed of advertisers and not viewers. Without cavil, it is the advertisers who are the primary source of revenue for both USA Network and Channel 9, and the advertisers are the entities for whose recognition the parties compete. As conceptualized by the Seventh Circuit Court of Appeals, broadcast cases are unique because "in an economic sense [viewers] are not the [parties'] customers, but rather, they (or their collective attention) are its product. The [parties'] customers are the advertisers who pay the stations to broadcast commercial messages to the [viewers]." *Walt-West Enterprises, Inc. v. Gannett Co., Inc.*, 695 F.2d at 1061.

There was ample, uncontroverted, and compelling testimony by defendants' experts at the hearing to demonstrate that there is virtually no possibility that advertisers would be confused by any similarity between plaintiff's marks and the mark which Channel 9 seeks to adopt. Media buyers who represent the advertisers are highly specialized professionals who exercise great care in placing an ad. Accordingly, there is no realistic possibility that media buyers would place an ad with a local broadcast station when they intended to place it with a national subscription cable network, or vice versa. Furthermore, most advertising agencies or buyer's services are structured so that the department

purchasing cable time is completely different from the department that purchases time on spot, or local, television. This structure minimizes the opportunity for confusion even more.

My judgment is reinforced by the other factors cited in *Beer Nuts*. As to appearance, I find that the marks do not look enough alike to be confusing, especially in their color versions.[4] On the intent issue, the only evidence relied upon by plaintiff to prove defendants' bad faith is the similarity of the marks. As I do not find the marks confusingly similar, I cannot, and will not, infer that they were consciously adopted in order that Channel 9 could pirate the reputation and good will developed by USA Network.

Finally, I find that although both the plaintiff and the defendant air television programs to the same potential viewing audience, and in so doing, compete for the advertisers' business, they do not offer identical products for use by advertisers. USA Network is a national cable network. Channel 9 is a Denver-based broadcast station. This distinction is not lost on advertisers whose job is to carefully schedule spots for their clients in order to hit a "target" demographic audience.

While I do not wish to make this opinion more broad than it need be to resolve the issue before me, I think a further note is important. Audience ratings are of key importance to both Channel 9 and USA Network because there is a direct link between ratings and revenues. Accordingly, confusion among the viewers may have a negative impact on both stations' ability to market their advertising time, or on the rate charged for that time. Yet, because of the mechanics by which the rating companies gather their viewer data, I believe there is no risk of confusion. For example, the A.C. Neilsen Company obtains its data from meters attached to sample viewers' television sets. These meters record the channel being watched; therefore, when the viewer is watching USA Network, the meter will record only that information.

---

**4.** The logos are appended to this opinion.

Thus, it becomes exceedingly difficult to imagine how Channel 9's change of call letters could confuse the Neilsen ratings. I believe the same analysis would apply to other rating services as well.

Accordingly, having determined that plaintiff has not carried its burden of proving a substantial likelihood of prevailing on the merits of its claims for trademark infringement, it is

ORDERED that the motion for preliminary injunction is denied.