UNITED STATES OLYMPIC COMMITTEE, a federally-chartered corporation, Plaintiff,

v.

AMERICAN MEDIA, INC., a Delaware corporation, and American Media Specials, Inc., a form unknown, Defendants.

No. 01–K–281.

United States District Court, D. Colorado.

Aug. 3, 2001.

---

Jeffrey George Benz, Coudert Brothers, San Francisco, CA, for Plaintiff.

Natalie Marie Hanlon–Leh, Faegre & Benson, Denver, CO, Lisa M. Sitkin, Steinhart & Falconer, San Francisco, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This matter is before me on the motion of Defendants American Media, Inc. and American Media Specials, Inc. (collectively "AMI") to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6). In its complaint, Plaintiff United States Olympic Committee ("USOC") alleges AMI violated the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 (2000) (the "Amateur Sports Act" or "the Act") by its publication of an Olympic preview magazine titled *OLYMPICS USA*. For the reasons stated below, I find USOC has failed to state a claim upon which relief can be granted and I therefore grant the motion to dismiss.

## I. BACKGROUND

The Amateur Sports Act was enacted in 1978 in large part to protect the USOC's ability to generate the funds necessary to send American athletes to the Olympic Games. *San Francisco Arts & Athletics,*

*Inc. v. USOC,* 483 U.S. 522, 537–39, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) ("*SFAA* "); *Stop the Olympic Prison v. USOC,* 489 F.Supp. 1112, 1120 (S.D.N.Y. 1980) ("*STOP* "). To this end, the Act grants the USOC exclusive rights to the "symbol of the International Olympic Committee, consisting of 5 interlocking rings," and "the [word] 'Olympic'." 36 U.S.C.A. § 220506(a)(2), (4); *see SFAA,* 483 U.S. at 528, 107 S.Ct. 2971. The USOC may license use of these marks to any contributor or supplier of goods or services who wishes to advertise that "the contributions, goods, or services were donated or supplied to, or approved, selected, or used by [the USOC]." *Id.* § 220506(b). The Act also provides that the USOC may file a civil action for the remedies provided in the Lanham Act if any person or corporation:

> Without the consent of the [USOC], *uses for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition—*
>
> (3) the word[ ] [Olympic] ... or any combination or simulation of [this] word[ ] tending to cause confusion ... or to falsely suggest a connection with the [USOC] ...; or
>
> (4) any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by ... the [USOC].
>
> *Id.* § 220506(c)(3), (4) (emphasis added).

■ By these terms, the Amateur Sports Act offers the USOC broader protection of its marks than traditional trademark law does because "the USOC need not prove that a contested use is likely to cause confusion, and an unauthorized user of the [marks] does not have available the normal statutory defenses." *SFAA,* 483 U.S. at 531, 107 S.Ct. 2971.

In this action, USOC alleges that, just before the 2000 Olympic Games in Sydney,

Australia, AMI published a magazine entitled *OLYMPICS USA* containing unauthorized uses of both the Olympic symbol and the word "Olympic."[1] Compl. at ¶ 6, 15. The magazine is composed primarily of several one- to four-page layouts describing thirty-two Olympic events. Each layout consists mainly of photographs of athletes participating in each event and a short description of the event. Interspersed among the layouts are a few article-length profiles of featured American athletes. The magazine also includes an event and broadcast schedule for the Sydney Olympics and paid advertisements.

The USOC alleges AMI violated the Amateur Sports Act by using USOC's alleged Olympic marks "for the purpose of trade and to induce the sale of goods," and to "pass off *OLYMPICS USA* as if it were authorized by the USOC, in a manner calculated to deceive the USOC's customers and members of the general public." *Id.* at ¶ 31. In particular, the USOC maintains that AMI violated the Act because the cover includes the words "OLYMPICS USA," in large print, and contains four images of athletes—three of whom represented the United States in Sydney—competing in Olympic sports. *Id.* at ¶ 16. The USOC also alleges the magazine contains "at least 35 occurrences

of 'OLYMPIC 2000'" as well as various other unauthorized uses of "Olympic marks and terminology" such as depictions of gold, silver, and bronze medals, the Olympic torch and flame, "USOC-provided Pan American Games team uniforms," and "stylized silhouettes" referring to various Olympic sports.[2] *Id.* at ¶¶ 14, 16, 18, 19. The USOC acknowledges that *OLYMPICS USA* contains a disclaimer denying affiliation with or sanction by the USOC on its table of contents page, but argues that it is ineffective because it is in smaller typeface than the surrounding text, does not refer to USOC by its full name, and does not appear on the title page.[3] Pl.'s Br. in Opposition to Def.'s R. 12(B)(6) [sic] Mot. to Dismiss 5 (Apr. 10, 2001) (hereafter "Pl.'s Br."). The USOC attached a copy of the magazine to its complaint to support its allegations. *Id.* at ¶¶ 15, 16.

In its complaint the USOC characterizes AMI's use of its alleged marks as "ambush marketing," *i.e.* an attempt to suggest association with the "Olympic Movement," and asserts that AMI's unauthorized use of its marks will encourage "other companies that are not Olympic sponsors/suppliers/licensees ... to use ... OLYMPIC [sic] marks and terminology without entering into a sponsorship, suppliership, or other licensing agreement with USOC." *Id.* at

1. AMI refers to this publication as both *"AMI Specials Salutes Our Athletes: Olympics USA,"* Br. in Support of Mot. to Dismiss by Def.'s American Media, Inc. and AMI Specials, Inc. 3 (Mar. 19, 2001) (hereinafter "AMI Br."), and *"AMI Specials Salutes Our Athletes/ OLYMPICS USA/ A Preview of America's Best."* Reply Br. in Support of Mot. to Dismiss by Defs. American Media, Inc. and AMI Specials, Inc. at 1 (April 24, 2001) (hereinafter "AMI Reply Br."). Because of the nature of the motion under consideration, I will refer to the magazine by the title USOC uses: *OLYMPICS USA.*

2. The USOC acknowledges that AMI's use of some of these symbols, such as the "stylized silhouettes representing the various Olympic

sports" *may* constitute a violation of the Act. Compl. at ¶ 19. I can only conclude that their doubt stems from the language of § 220506(c)(4), which does not specify which "trademark[s], ..., sign[s], [or] symbol[s]" would falsely suggest affiliation with the USOC.

3. The disclaimer reads, "American Media, Inc. And Olympics USA are not affiliated, sanctioned or licensed by the ... USOC ... and has [sic] no official status or affiliation with the Olympic Games. American Media, Inc. and Olympics USA are not official sponsors of the Olympic Games and are not affiliated with any such sponsors, nor do they claim any ownership rights to any of the Olympic trademarks."

¶ 23. The USOC also claims AMI's unauthorized use will "likely impair the USOC's relationships with its existing and prospective sponsors, suppliers, and other licensees and undermine their willingness to pay ... sponsorship, suppliership, and other licensing royalties." *Id.* at ¶ 24. Therefore, USOC asserts AMI's unauthorized use of "Olympic marks and terminology" will adversely affect its ability to generate the funds it needs to fulfill "its Congressionally-mandated [sic] responsibility of funding the United States' participation in the Olympic Games." *Id.*

In its Motion to Dismiss, AMI argues that the USOC has failed to state a claim upon which relief can be granted because *OLYMPICS USA* was not intended "for the purpose of trade, to induce the sale of goods or services, or to promote any ... athletic performance," but rather is an editorial publication that is entirely non-commercial in nature. AMI Br. at 7. Therefore, AMI contends, by its own terms the Amateur Sports Act does not reach their publication. Alternatively, if the Amateur Sports Act can be read to apply to non-commercial speech such as *OLYMPICS USA,* AMI asserts the Act violates the First Amendment and is unconstitutional as applied. AMI Br. at 1, 7–8, 12–14; *see* Notice of Claim of Unconstitutionality at 2–3 (May 4, 2001).

## II. STANDARD OF REVIEW

 The court's function in evaluating a 12(b)(6) motion is "to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999) (quotation omitted). "All well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the non-moving party." *Id.* (citation omitted). The motion should be denied unless there is virtually no doubt that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

 As a general rule only the "four corners" of the pleadings themselves can be examined in deciding a 12(b)(6) motion. *See Jojola v. Chavez,* 55 F.3d 488, 494 (10th Cir.1995) (citing *Doyle v. Oklahoma Bar Ass'n,* 998 F.2d 1559, 1566 (10th Cir. 1993)). In this case, however, I may consider the copy of *OLYMPICS USA* attached to the complaint in assessing the sufficiency of USOC's allegations. When a document is referred to in the complaint and is central to the plaintiff's claim, the court has discretion to consider the document as part of the pleadings. *See, e.g., Prager v. LaFaver,* 180 F.3d 1185, 1188–89 (10th Cir.1999). In *Prager,* the plaintiff referred to certain documents that were essential to his claim, but did not attach them to his complaint. The defendant then attached these documents to his 12(b)(6) motion, and argued that the court must consider them part of the pleadings in deciding his motion. *Id.* at 1188. The court concluded that as long as the document in question is referred to in the plaintiff's complaint and is central to his claim, the district court has discretion to consider it part of the pleadings in a 12(b)(6) motion. *Id.* at 1189. In so doing, the Tenth Circuit implied that if, as in this case, the document had been attached to the complaint, it would more readily be considered part of the complaint. *Id.* In this case, then, because the magazine is referred to in USOC's complaint, attached to the complaint by USOC as an exhibit, and is central to USOC's claim, I have discretion to consider the magazine as part of the pleadings.[4] As discussed below, the commercial or non-commercial nature of

4. The issue of whether it is permissible to

examine the magazine in the context of this

the magazine itself is the threshold issue in deciding AMI's motion. I therefore consider it part of the pleadings.

## III. MERITS

▮ This motion to dismiss raises three issues for determination: (1) whether the provision of the Amateur Sports Act relied upon by USOC can be applied to anything other than commercial speech; (2) whether *OLYMPICS USA* is commercial or non-commercial speech; and (3) if the provision of the Act relied upon by USOC applies to non-commercial speech, whether the Act is unconstitutional as applied.[5] For reasons set forth below, I find the provision of the Amateur Sports Act relied upon by USOC does not apply to the use of protected Olympic marks in non-commercial speech, that *OLYMPICS USA* is non-commercial speech, and that USOC has therefore failed to state a claim upon which relief may be granted. As these holdings are determinative of AMI's motion, I need not reach its constitutional argument, and therefore do not consider it.

### A. *Interpretation of the Amateur Sports Act*

In *SFAA,* the Supreme Court addressed the constitutionality and the scope of the Amateur Sports Act.[6] The Court found that the Act grants the USOC exclusive rights to Olympic marks only in certain contexts. *See SFAA,* 483 U.S. at 526, 533–34, 107 S.Ct. 2971. (Act grants USOC the right to prohibit certain "commercial and promotional" uses of the word "Olympic" and various other Olympic symbols). In this case, the USOC alleges AMI violated § 220506(c) of the Amateur Sports Act by using its marks "for purposes of trade and to induce the sale of goods, namely sale of *OLYMPICS USA.*" Compl. ¶ 30. According to the Supreme Court, "to the extent that [the Amateur Sports Act] applies to uses 'for the purpose of trade [or] to induce the sale of any goods or services,' ... its application is to *commercial speech.*" 483 U.S. at 535, 107 S.Ct. 2971 (emphasis added).[7]

The Court relied on this finding to respond to arguments by the petitioners and the dissent that the Act violated the First Amendment by granting the USOC exclusive rights to Olympic words and symbols. *See SFAA,* 483 U.S. at 527–28, 534, 536 n. 15, 107 S.Ct. 2971. The Court found that because the Act applies primarily to commercial speech, which "receives a limited form of First Amendment protection," the Act is not over broad and is "well within

---

motion was raised by AMI. It argues that cases involving First Amendment claims are subject to "heightened scrutiny at the pleading stage," which favors early dismissal. AMI Br. at 2, 5–6; *see* AMI Reply Br. at 2–4. In response, USOC argues that, for various reasons, the heightened scrutiny standard does not apply to this case. *See, e.g.,* Pl's Br. at 7–9. However, for the reasons stated above, it is not necessary to address whether the heightened scrutiny standard applies at all. Therefore, neither AMI's nor USOC's arguments on this issue are considered.

5. This framework departs from those set out by the parties in their briefs because the briefs were not helpful and did not focus on the key issues in this case, particularly the commercial speech issue.

6. This decision is difficult to decipher in many respects and capable of different interpretations. *See, e.g.,* Robert N. Kravitz, *Trademarks, Speech, and the* Gay Olympics *Case,* 69 B.U.L.Rev. 131 (1989). I have taken a straight-forward approach to interpreting the decision and have not tried to make sense of the often murky reasoning.

7. The only other courts to consider the provision of the Act, both decided before *SFAA,* also agreed it applied only to commercial speech. *See USOC v. Intelicense Corp.,* 737 F.2d 263, 267 (2d Cir.1984); *STOP,* 489 F.Supp. at 1120–21 (cited with approval in *SFAA,* 483 U.S. at 536 n. 14, 107 S.Ct. 2971).

constitutional bounds." *Id.* at 535, 536 n. 15, 107 S.Ct. 2971.[8]

The Court also addressed the portion of § 220506(c) that allows the USOC to prohibit uses of Olympic marks "to promote any theatrical exhibition, athletic performance, or competition." The Supreme Court concluded this provision of the Act might in some circumstances incidentally restrict non-commercial speech. The issue arose because in *SFAA* the USOC challenged SFAA's use of the term "Olympic" to promote the "Gay Olympic Games." *Id.* at 539, 107 S.Ct. 2971. The Court found that this partly political use of "Olympic" was forbidden by the Act, even though it went "beyond the 'strictly business' context," because the word was used to promote an athletic event. *Id.* at 535, 540, 107 S.Ct. 2971. The Court reasoned that because much of the distinction of the word "Olympic" comes from its association with athletics, an unauthorized use of the word to promote an athletic event would inevitably invoke "the image carefully cultivated by the USOC." *Id.* at 540–41, 107 S.Ct. 2971. The Court then found that any such "incidental" restrictions on non-commercial speech that might arise in the context of promotional uses of "Olympic" were justified by the governmental interest in allowing the USOC exclusive control over promotional uses of "Olympic," and therefore such restrictions did not violate the First Amendment. *Id.* at 536–37, 107 S.Ct. 2971 (employing the balancing test set forth in *U.S. v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). The Court emphasized, however, that despite its holding in *SFAA,* "the extent to which the Act may be [applied] to noncommercial speech is limited" and therefore found that there was "no realistic danger

that the statute ... will significantly compromise ... First Amendment protections of parties not before the Court." *Id.* at 537 n. 15, 107 S.Ct. 2971 (internal quotation marks omitted).

In this case, the USOC does not allege that AMI used any of its marks "to promote an athletic performance or competition." Rather, as stated above, the USOC has consistently alleged that AMI violated the Act by using the USOC's marks, without its consent, "for the purpose of trade, [and] to induce the sale of goods." Pursuant to the Supreme Court's ruling in *SFAA,* this portion of the Act applies only to commercial speech. USOC can only state a claim under the Act, therefore, if *OLYMPICS USA* can be characterized as commercial speech.

## B. *Commercial Speech Doctrine*

There is ample case law in the Supreme Court and elsewhere defining commercial speech. Most of these cases address the validity under the First Amendment of government or private regulations that restrict commercial advertising in certain contexts. *See, e.g., Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (federal statute prohibiting beer labels from displaying alcohol content); *Board of Trustees of State University of N.Y. v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (ban on commercial advertising in dormitories); *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (ban on promotional advertising by the utility); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48

---

**8.** The only other courts to consider this provision of the Act, both decided before *SFAA,* also agreed it applied only to commercial speech. *See USOC v. Intelicense Corp.,* 737 F.2d 263, 267 (2d Cir.1984); *STOP,* 489 F.Supp. at 1120–21 (cited with approval in *SFAA,* 483 U.S. at 536 n. 14, 107 S.Ct. 2971).

L.Ed.2d 346 (1976) (state statute forbidding licensed pharmacists to advertise prices of prescription drugs). Both parties ignore most of this authority in their briefs or apply it in novel or obscure ways, so what follows clarifies the issue of what constitutes commercial speech, and determines whether *OLYMPICS USA* can be characterized as such.

 Commercial speech receives limited First Amendment protection and has therefore been narrowly defined by the Supreme Court. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (application of statute regulating commercial speech "must be examined carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed."). The Supreme Court defines commercial speech as "speech which does 'no more than propose a commercial transaction'," *Virginia State Bd.*, 425 U.S. at 762, 96 S.Ct. 1817 (quoting *Pittsburgh Press Co. v. Pittsburgh Commn. on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)), and as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec.*, 447 U.S. at 561, 100 S.Ct. 2343 (citing *Virginia State Bd.*, 425 U.S. at 762, 96 S.Ct. 1817). Any consideration of whether speech is commercial should rest on "'the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.'" *Bolger*, 463 U.S. at 64, 103 S.Ct. 2875 (*quoting Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)).

 In *Bolger*, the Supreme Court listed three factors to be considered in determining whether speech is commercial: (1) whether the speech in question is concededly an advertisement; (2) whether it makes reference to a specific product; and (3) whether it is motivated by economic interest. 463 U.S. at 66–67, 103 S.Ct. 2875. In applying this test, the Court advised that a finding of just one of the factors does not make speech commercial, but "the combination of *all* these characteristics ... provides strong support for the ... conclusion that the [speech in question can be] properly characterized as commercial speech." *Id.* at 67, 103 S.Ct. 2875. In all cases, the core question for determining whether speech is commercial is whether the speech proposes a commercial transaction. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

USOC first argues that *OLYMPICS USA* is commercial speech because it "solicit[s] consumers to purchase the publication." Pl.'s Br. at 11. Considering the three-factor test applied in *Bolger*, however, USOC's argument is meritless. Even the most cursory examination of the magazine reveals that it is not "concededly an advertisement" and that it does not refer to a specific product. The most that can be said for USOC's position on this point is that the publication of the magazine was arguably motivated by profit, but under *Bolger* and other authority, that in itself is insufficient to characterize the magazine as commercial. *Bolger*, 463 U.S. at 67, 103 S.Ct. 2875 ("an economic motivation ... would clearly be insufficient by itself to turn the materials [in question] into commercial speech."); *see also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *New Kids on the Block v. News America Publishing, Inc.*, 745 F.Supp. 1540, 1544 (C.D.Cal.1990) ("A profit motive ... is irrelevant to the inqui-

ry of whether the content of ... speech ... is ... commercial [or otherwise]" (citing *Pittsburgh Press*, 413 U.S. at 385, 93 S.Ct. 2553)). To hold otherwise would convert virtually all books, newspapers, and magazines into commercial speech, and call into question the traditional protections afforded these types of publications.

Other cases considering whether speech similar to that at issue here was commercial support the conclusion that *OLYMPICS USA* is not commercial speech. In *Securities & Exchange Commission v. Wall Street Publishing Institute*, 851 F.2d 365 (D.C.Cir.1988), for example, the D.C. Circuit considered articles published by a securities trade journal that featured particular firms' securities in return for consideration provided by those firms. *Id.* at 367. Among the issues in the case was whether the articles could be characterized as commercial speech. *Id.* at 372. The court discussed the commercial speech doctrine and concluded that, under *Bolger*, the articles were not commercial speech because they were "not 'conceded' to be advertisements," were "indistinguishable from run-of the mill newspaper or magazine stories," and did not specifically mention any company's stock. More importantly, the court noted that characterizing the articles as commercial risked defining commercial speech too broadly, and that it was "difficult to foresee the implications of applying the doctrine" in this manner. *Id.*

In *New Kids on the Block*, the district court for the Central District of California considered the plaintiff's claim that the news media defendants' articles soliciting 900 number calls for a readers' poll was commercial speech. 745 F.Supp. at 1544. The court flatly rejected this argument, in part because of the strong presumption against characterizing media publications 'as commercial speech. *Id.; see also Coors Brewing*, 514 U.S at 494, 115 S.Ct. 1585 (Stevens, J., concurring) ("Surely a piece

of newsworthy information on the cover of a magazine ... is entitled to full constitutional protection."). The court disagreed with the plaintiff's argument that the articles were a "disguised advertisements for the sale of a collateral commercial product—namely, the 900 number service," and found instead that the solicitations were legitimate news gathering activity and therefore were non-commercial speech and fully protected by the First Amendment. *New Kids*, 745 F.Supp. at 1543, 1544.

The USOC also argues that AMI made "commercial use" of "Olympic" and related marks by using them "in a trademark sense on the cover and throughout the publication in such a way as to suggest official endorsement, authorization, or involvement by the USOC in *OLYMPICS USA*." Pl's Br. at 11. This argument, however, simply begs the question of what constitutes "commercial speech" in the first place. To the extent that the marks in question solicit consumers to buy the publication, it has already been established that this in itself is not enough to conclude that AMI used USOC's alleged marks in a commercial sense. Furthermore, USOC's attempt to distinguish these alleged "commercial uses" of this mark from what it calls the "editorial context" of the magazine is not persuasive. Even if such uses could somehow be considered "commercial speech," the commercial speech doctrine requires me to focus on the speech as a whole in determining whether it can be characterized as commercial. *See, e.g. Fox*, 492 U.S. at 473–74, 109 S.Ct. 3028 (when speech combines commercial and non-commercial elements, it will be characterized as commercial speech when its primary purpose is to "propose a commercial transaction.").

In support of its motion to dismiss, AMI simply asserts that the magazine is not commercial speech, and therefore the Act

does not reach it. AMI Br. at 9–11. But AMI then makes an alternative argument that if I nonetheless find that the Act does apply, *OLYMPICS USA*, the title of the magazine can be evaluated separately as "hybrid speech" (*i.e.* speech that combines artistic and commercial elements), which is allegedly protected speech under the First Amendment. *Id.* at 10–11. Given the Supreme Court's interpretation of the Act in *SFAA* and the arguments presented above, however, I do not need to address this argument. The portion of the Act relied on by USOC is indeed limited to commercial speech.

In summary, to characterize all or any part of *OLYMPICS USA* as commercial speech would go against nearly every attempt to define commercial speech. *OLYMPICS USA* does not 'propose a commercial transaction,' and its content goes beyond the 'economic interests of the speaker and its audience.' More importantly, though, to apply the commercial speech doctrine in this context would unduly broaden the limited definition of commercial speech, and would raise serious concerns about the status of news media organizations' presumed First Amendment protection. Moreover, because the Amateur Sports Act grants the USOC rights over and above both the common law and general legislation (*i.e.*, the Lanham Act), *see SFAA*, 483 U.S. at 531, 107 S.Ct. 2971, the language and scope of the Act must be strictly construed. To extend the Act to give the USOC authority over speech that clearly is not commercial under established First Amendment doctrine would violate

this principle. Therefore, *OLYMPICS USA* should not be characterized as commercial speech. As a result, under *SFAA*, USOC has not stated a claim for which relief can be granted under the Amateur Sports Act.

### 1. *Other Considerations*

■ This interpretation of the Amateur Sports Act and commercial speech doctrine does not permit piracy of USOC's marks simply because they appear in a non-commercial writing. The Lanham Act is available to prevent this type of wrongdoing, but it requires a claimant to prove its charge. If, therefore, the USOC holds traditional trademark rights to its marks, it can defend those rights under the Lanham Act.[9] Thus, if the USOC is correct in its assertion that "use of its marks in a trademark sense on the cover and throughout [*OLYMPICS USA* ] ... suggest official endorsement, authorization, or involvement by the USOC," it can pursue those claims under the Lanham Act.

■ This is so even if the magazine is deemed non-commercial speech. It is accepted doctrine that the Lanham Act may restrict non-commercial speech "where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989).[10] The *Rogers* court suggested this balance favors restricting non-commercial speech where trademarks either have "no ... relevance to the underlying work whatsoever" or are used in

---

9. Based on references in both *SFAA*, 483 U.S. at 529, 107 S.Ct. 2971, and *Stop*, 489 F.Supp. at 1121 n. 28. It appears USOC continues to hold a registered trademark to "Olympic" and other related marks. Of course, it would have to prove this if it chooses to pursue a Lanham Act claim.

10. The speech at issue in *Rogers* was the title to a movie. 875 F.2d at 997, 1000. In that case, the court found the title "Ginger and Fred" did not create a false impression that Plaintiff Ginger Rogers was the subject of or involved with the film because the title was artistically relevant to the content of the film, and was only "implicitly ambiguous" as to endorsement or involvement by the Plaintiff.

a manner that is "explicitly misleading as to source or content." *Id.*

This standard, which was employed by the *Rogers* court in order to accommodate both the property rights of trademark holders and the First Amendment concerns raised by overextension of the Lanham Act, was applied in the context of a news publication in *New Kids on the Block.* 745 F.Supp. at 1545 (adopting the *Rogers* test in the context of news publications). That court stated that use of the plaintiff's trademark in a newspaper article would not be prohibited "unless the defendants explicitly and falsely denoted authorship, sponsorship, or endorsement by [the plaintiffs] or explicitly mislead as to content." In this case, should the USOC choose to pursue a Lanham Act claim, the same standard could be applied to determine whether AMI's use of USOC's alleged marks in *OLYMPICS USA* either falsely denotes affiliation with or endorsement by the USOC or explicitly misleads the public about the content of the magazine.

In its complaint, the USOC does not cite to the Lanham Act or claim trademark infringement under that Act. It does, however, allege at several points one of the two elements of a Lanham Act infringement claim: that AMI's use of its marks is "likely to confuse" to public because it falsely implies affiliation with or endorsement by the USOC. Compl. at ¶¶ 13, 14, 31, 32; *see,* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A). The complaint does not, however, allege facts that demonstrate the validity of USOC's claimed marks (*i.e.* that they are registered or established under common law), which is the second element of a Lanham Act infringement claim.. *See, e.g., USA Network v. Gannett Co., Inc.,* 584 F.Supp. 195, 198 (D.Colo.1984). The USOC is given leave to amend its complaint to make a sufficient Lanham Act claim.

Finally, the USOC argues, but does not allege in its complaint, that it has "contractual arrangements with official broadcasters, sponsors, suppliers, and licensees, including Time, Inc. and [NBC]," which authorize these entities to "produce and/or advertise and promote publications like AMI's using the Olympic-related marks and symbols." Pl.'s Br. at 5 n. 3. The USOC suggests that an adverse ruling on this motion would threaten these relationships, and asks leave to amend its complaint should this Court find these allegations determinative. *Id.* Whether it is true that USOC's existing business arrangements will be affected by this ruling is unclear, but in any event this concern is not material to this action. The Act does not say, and cannot be construed to mean, that any use of the word "Olympic" or related Olympic marks is forbidden if it threatens USOC's existing licensing agreements. The USOC's agreements with other entities are valid or not on their own terms, and do not influence the disposition of this motion.

## IV. CONCLUSION

AMI's publication does not meet the Supreme Court's definition of commercial speech. Therefore, in accordance with the Supreme Court's interpretation of the relevant portion of the Amateur Sports Act, USOC has failed to state a claim for violation of that Act. Construing the allegations made in the complaint liberally, however, the USOC comes close to making a Lanham Act claim. Therefore, leave is granted to amend the complaint if the amendment is made within twenty days from the date of this order.